# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDREW JUSTIN CAMPBELL,

        Defendant-Appellant.

UNPUBLISHED
October 18, 2016

No. 327059
Wayne Circuit Court
LC No. 14-010082-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ISAIAH SANDERS,

        Defendant-Appellant.

No. 327060
Wayne Circuit Court
LC No. 14-010082-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARVIN LAMAR WILBURN,

        Defendant-Appellant.

No. 327061
Wayne Circuit Court
LC No. 14-010082-FC

---

Before: MURRAY, P.J., and CAVANAGH and WILDER, JJ.

PER CURIAM.

-1-

Defendant, Andrew Justin Campbell, appeals as of right his bench trial convictions of armed robbery, MCL 750.529, carjacking, MCL 750.529a, and unlawfully driving away an automobile (UDAA), MCL 750.413.[1] Campbell was sentenced to 15 to 35 years' imprisonment each for his armed robbery and carjacking convictions and one to five years' imprisonment for his UDAA conviction.

Defendant, Isaiah Sanders, appeals as of right his jury trial convictions of armed robbery, carjacking, UDAA, felon in possession of a firearm, MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and reckless driving, MCL 257.626. Sanders was sentenced, as a second habitual offender, MCL 769.10,[2] to 23 years and 9 months to 75 years' imprisonment each for his armed robbery and carjacking convictions, 1 to 10 years' imprisonment each for his UDAA and felon in possession of a firearm convictions, two years' imprisonment for his felony-firearm conviction, and 93 days' imprisonment for his reckless driving conviction.

Defendant, Marvin Lamar Wilburn, appeals as of right his jury trial convictions of armed robbery, carjacking, UDAA, felon in possession of a firearm, two counts of felony-firearm, second offense, and carrying a concealed weapon, MCL 750.227. Wilburn was sentenced, as a third habitual offender, MCL 769.11,[3] to 35 years and 6 months to 70 years' imprisonment each for his armed robbery and carjacking convictions, one to five years' imprisonment each for his UDAA, felon in possession of a firearm, and carrying a concealed weapon convictions, and five years' imprisonment for each of his felony-firearm, second offense convictions.

Defendants were convicted at a joint trial in which Campbell was tried by the trial court and in which Sanders and Wilburn were each tried by a separate jury. The appeals were consolidated to advance the efficient administration of the appellate process. *People v Campbell*,

---

[1] Also, at the conclusion of the bench trial, the trial court found Campbell guilty of carrying a concealed weapon, MCL 750.227, and the trial court stated at Campbell's sentencing hearing that it was sentencing Campbell to one to five years' imprisonment for his carrying a concealed weapon conviction, but the carrying a concealed weapon conviction and sentence are not reflected on Campbell's judgment of sentence. On remand, the trial court shall correct the judgment of sentence to reflect Campbell's conviction and sentence for carrying a concealed weapon. See MCR 6.435(A); MCR 7.216(A)(7).

[2] Sanders's judgment of sentence does not refer to his status as a second habitual offender, but Sanders was charged as a second habitual offender, and the trial court at sentencing calculated Sanders's guidelines range on the basis of his status as a second habitual offender. On remand, the trial court shall correct the judgment of sentence to reflect that Sanders was sentenced as a second habitual offender. See MCR 6.435(A); MCR 7.216(A)(7).

[3] Wilburn's judgment of sentence does not refer to his status as a third habitual offender, but Wilburn was charged as a third habitual offender, and the trial court at sentencing calculated Wilburn's guidelines range on the basis of his status as a third habitual offender. On remand, the trial court shall correct the judgment of sentence to reflect that Wilburn was sentenced as a third habitual offender. See MCR 6.435(A); MCR 7.216(A)(7).

unpublished order of the Court of Appeals, entered April 29, 2015 (Docket Nos. 327059, 327060, 327061). We affirm defendants' convictions. With respect to defendants' sentences, we remand for implementation of the *Crosby*[4] remand procedure and for various corrections and clarification on sentencing issues as set forth in this opinion.

In his Standard 4 brief, Wilburn argues that there was insufficient evidence to support his carjacking conviction. We disagree. To determine whether there was sufficient evidence to support a conviction, this Court reviews the evidence de novo, in the light most favorable to the prosecutor, to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

Our Supreme Court has described the elements of carjacking as follows:

A carjacking occurs "in the course of committing a larceny of a motor vehicle[.]" While doing so, a defendant must use (1) "force or violence," (2) "the threat of force or violence," or (3) put "in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle." [*People v Hardy*, 494 Mich 430, 444; 835 NW2d 340 (2013) (alteration in original), quoting MCL 750.529a(1).]

Also, identity is an element of every criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

An aider and abettor may be convicted as though he directly committed the offense. MCL 767.39; *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001). In order to establish guilt under an aiding and abetting theory, the prosecutor must show that:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Bennett*, 290 Mich App at 472 (alteration in original), quoting *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

"Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the

---

[4] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

crime." *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999). "An aider and abettor's knowledge of the principal's intent can be inferred from the facts and circumstances surrounding an event." *Bennett*, 290 Mich App at 474. Factors that may be considered "in determining [an] aider and abettor's state of mind include [a] close association between the defendant and the principal, the defendant's participation in planning or executing the crime, and evidence of flight after the crime[.]" *Norris*, 236 Mich App at 421.

Wilburn's sufficiency argument does not focus on any specific element of carjacking but asserts that it is speculative to conclude that he participated in committing the offense. We disagree. Defendants were convicted for the armed robbery and carjacking of Bernard Ogburn on October 24, 2014, in Detroit, Michigan. Wilburn and Sanders were seen together inside another stolen vehicle, a black Ford Explorer, on the night before the carjacking of Ogburn. Ogburn testified that as he was getting into his burgundy Ford Explorer, a black Explorer approached, and Sanders then appeared and hit Ogburn in the face with a gun, injuring his lip and breaking his glasses. As Sanders and Ogburn fought over the gun, another man appeared on the side of the black Explorer and pointed another gun at Ogburn. Ogburn could not see the second man well enough to identify him because Ogburn's glasses had been broken. Sanders or the other man then "mushed" Ogburn "upside the head" with a gun and said, "[G]imme this truck bitch." Ogburn let Sanders and the other man have the burgundy Explorer. One of the men pushed Ogburn away, and Ogburn partially fell to the ground. The men got in Ogburn's vehicle and drove away. Later that day, following a police chase of the stolen burgundy Explorer, Wilburn got out of the vehicle, removed a handgun from his waistband, tossed it to the ground, and ran before being apprehended and arrested. Wilburn later made an oral statement to police admitting that he had participated in taking the burgundy Explorer and that he had a gun. Wilburn said that he was riding in the stolen black Explorer when he and his cohorts saw an "old man" in the burgundy Explorer, whereupon "we turned around and took his s---, too." This evidence, including Ogburn's testimony describing the crime, defendant's running out of the stolen vehicle and throwing a gun to the ground, and defendant's statement admitting his participation in the crime, was sufficient to support defendant's conviction. Defendant's flight from police may also suggest consciousness of guilt. "It is well established that evidence of flight is admissible to show consciousness of guilt." *People v Compeau*, 244 Mich App 595, 598; 625 NW2d 120 (2001). "[I]t is always for the jury to determine whether evidence of flight occurred under such circumstances as to indicate guilt." *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008).

Next, Sanders and Wilburn (in his Standard 4 brief) each argue that his Sixth Amendment right of confrontation was violated by the admission of statements made by his respective nontestifying codefendants even though the trial court provided a proper limiting instruction at the joint trial. We disagree.

To preserve an argument that the admission of evidence violates the Confrontation Clause of the Sixth Amendment, a defendant must raise an objection or move for a mistrial on that ground below. *People v Pipes*, 475 Mich 267, 278; 715 NW2d 290 (2006); *People v Jackson*, 292 Mich App 583, 594; 808 NW2d 541 (2011). Neither Sanders nor Wilburn objected or moved for a mistrial on that ground. Although Campbell raised a Confrontation Clause challenge after the statements were admitted, neither Sanders nor Wilburn joined that argument. Therefore, the issue is unpreserved.

-4-

Whether a defendant's Sixth Amendment right of confrontation is violated presents a question of constitutional law that is reviewed de novo. *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011). Unpreserved constitutional issues, however, are reviewed for plain error affecting substantial rights. *Id*. at 537; *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Under the plain error rule, a defendant must demonstrate that an error occurred, that it was clear or obvious, and that it affected substantial rights, i.e., that it affected the outcome of the proceedings. *Carines*, 460 Mich at 763. If these requirements are satisfied, reversal is warranted only when the error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the proceedings. *Id*. at 763-764.

A defendant's right of confrontation under the Sixth Amendment includes the right to cross-examine witnesses. *Richardson v Marsh*, 481 US 200, 206; 107 S Ct 1702; 95 L Ed 2d 176 (1987).

> Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions. [*Id*.]

A narrow exception to this principle, however, was recognized in *Bruton v United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968). See *Richardson*, 481 US at 207. The United States Supreme Court held in *Bruton* "that a defendant was deprived of his Sixth Amendment right to confrontation when the facially incriminating unredacted confession of a nontestifying codefendant was admitted at their joint trial, even if the jury was instructed to consider the confession only against the codefendant." *People v Akins*, 259 Mich App 545, 560; 675 NW2d 863 (2003). "In *Bruton*, the codefendant's confession expressly implicated the defendant as his accomplice." *Richardson*, 481 US at 208 (quotation marks and brackets omitted). The codefendant's confession in *Bruton* was thus deemed to be "powerfully incriminating." *Id*., quoting *Bruton*, 391 US at 135. In *Richardson*, however, the codefendant's "confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Richardson*, 481 US at 208.

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule. [*Id*.]

-5-

The *Richardson* Court thus held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id*. at 211.

In applying the principles set forth in *Bruton* and *Richardson*, our Supreme Court has "observed that the line between inferential incrimination and direct implication is thin." *People v Frazier*, 446 Mich 539, 550; 521 NW2d 291 (1994) (opinion of BRICKLEY, J.), citing *People v Banks*, 438 Mich 408, 419; 475 NW2d 769 (1991).

> Drawing this line requires a careful examination of the specific details disclosed in each codefendant's statement and analysis of whether the statement may have implicated any of the other codefendants when the context of all the evidence introduced during the trial is taken into consideration. [*Frazier*, 446 Mich at 550 (opinion of BRICKLEY, J.).]

In *Frazier*, minimal redactions of statements of nontestifying codefendants were made to substitute the term "friend" whenever there was a pejorative reference to a person other than the declarant. *Id*. at 553. Our Supreme Court concluded that "the minimally redacted statements introduced in this case did not powerfully incriminate any particular defendant. The defendants were not named, and any inference regarding identity that could be drawn was sufficiently attenuated to warrant confidence in the effectiveness of the limited use instruction." *Id*. at 567; *id*. at 568 (RILEY, J., concurring).

In this case, defendants' confessions did not facially incriminate their respective codefendants. Defendants' confessions did not refer by name to any defendant other than the one making the statement. Campbell's statement admitted that he participated in the carjacking and indicated that "[t]hey pull[ed] up on a[n] old guy and" robbed him, and that "we sped off." Campbell denied that it was his idea to rob Ogburn and indicated that Ogburn was lying on the ground when Campbell got out of the black Explorer and stepped into the burgundy Explorer. Sanders's statement indicated that "we" took the burgundy Explorer from Ogburn and that "[m]y boy" got Ogburn out of the burgundy Explorer and hit him a couple of times while holding a gun. Sanders said that "the n---- with the .45 cal drove the burgundy" Explorer away. Sanders said that "we" later dumped the black Explorer, that "we" then robbed another person of sunglasses and a Rolex watch, and that "[t]wo of my n----s jumped out and robbed" that person. Wilburn's statement indicated that "[w]e" took the burgundy Explorer from Ogburn, that "we" later got rid of the black Explorer, and that "[w]e" had three guns. Wilburn further said that "[w]e" stole sunglasses and a Rolex watch from another person and that "they was throwing s--- out of the windows of the car, I was picking that s--- up too."

In short, each defendant's statements used generic terms or pronouns such as "we" or "they" when describing the commission of the crimes. None of the statements facially incriminated any of the other defendants. Any incriminatory inference arising from the linkage of defendants' statements with testimony by police officers that defendants were all apprehended and arrested during the pursuit of the fleeing burgundy Explorer, thereby arguably suggesting that each defendant's statement may have been referring to his codefendants, is sufficiently attenuated to justify confidence that the limited use instruction given by the trial court was

effective. See *Richardson*, 481 US at 208; *Frazier*, 446 Mich at 567 (opinion of BRICKLEY, J.); *id*. at 568 (RILEY, J., concurring). Indeed, it is unclear from any of the statements which if any of each declarant's codefendants are being referenced. It is also notable that some police testimony indicated that there was or may have been a fourth person in the fleeing stolen vehicle,[5] thereby further attenuating any inference that a reference in any statement to other participants in the crime was meant to refer to any particular codefendant. Overall, defendants' statements were not so powerfully incriminating that either Sanders or Wilburn was deprived of his Sixth Amendment right of confrontation where the jury was properly instructed to consider each defendant's confession only against that defendant.

Sanders argues that the prosecutor's rebuttal closing argument effectively undid the trial court's limiting instruction by urging consideration of statements of other defendants when deciding each defendant's guilt or innocence. The prosecutor's rebuttal closing argument did make some comparisons of defendants' statements, primarily to note that Wilburn's statement included additional details concerning the crimes that were not provided by Campbell and Sanders. The prosecutor was seeking to rebut Wilburn's claim that he did not actually make his statement, which he had refused to sign. But the prosecutor did not suggest that any particular defendant was incriminated by the statement of any other defendant; the prosecutor was instead seeking to use Wilburn's own statement, and the presence of additional details in that statement, against Wilburn himself. To the extent that the prosecutor's argument improperly suggested comparison of the statements, any prejudice was cured by the trial court's final instruction to the juries regarding the limited use of each defendant's statement. See *Frazier*, 446 Mich at 567 (opinion of BRICKLEY, J.) ("If there was a chance the jury might have been misled by the prosecutor's choice of words, the harm was cured by the final instruction given by the judge.").

But even if a *Bruton* error occurred, it was harmless. A *Bruton* error is subject to harmless error analysis, and a defendant's own confession along with other properly admitted evidence may be considered in determining whether the error was harmless. *Pipes*, 475 Mich at 276-277, 280-283. Because Sanders and Wilburn failed to preserve this issue, this Court's review is for plain error affecting substantial rights. *Id*. at 277-279. In Sanders's case, there was overwhelming evidence of guilt comprised of Ogburn's testimony identifying Sanders as the person who struck Ogburn's face with a gun during the carjacking; police testimony concerning Sanders's operation of the fleeing stolen burgundy Explorer during the chase by police, his ramming or sideswiping of a police vehicle during the chase, and his subsequent attempt to flee the police on foot; and Sanders's own statement confessing his role in the crimes. In Wilburn's case, there was again significant evidence of guilt that included police testimony concerning Wilburn's presence in the stolen burgundy Explorer during the flight from police and his getting out of the stolen vehicle, removing a handgun from his waistband, tossing it to the ground, and running away; and Wilburn's own statement admitting his role in the crimes. Given the strong evidence of guilt with respect to both Sanders and Wilburn, we conclude that any *Bruton* error was harmless, and reversal of their convictions is not required. *Id*. at 283.

---

[5] As the trial court explained in its bench trial findings in Campbell's case, a fourth participant, Claudius Morrow, pleaded guilty to offenses in connection with this incident.

In his Standard 4 brief, Wilburn argues in the alternative that he was deprived of the effective assistance of counsel when his trial attorney failed to object to the purported *Bruton* error. We disagree. An ineffective assistance of counsel issue is preserved if it was raised in a motion for a new trial or a *Ginther*[6] hearing in the trial court. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Wilburn did not file a motion for a new trial or a *Ginther* hearing in the trial court. His ineffective assistance of counsel claim is therefore unpreserved. "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. (citation omitted). Because Wilburn's claim of ineffective assistance of counsel is unpreserved, this Court's review is limited to mistakes apparent on the record. *Id*.

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability [exists] that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). "Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Petri*, 279 Mich App at 411. This Court does not substitute its judgment for that of counsel regarding matters of trial strategy, nor does it assess counsel's performance with the benefit of hindsight. *Id*. A defendant claiming ineffective assistance has the burden of establishing the factual predicate for the claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Wilburn argues that his trial counsel was ineffective for failing to object to the purported *Bruton* error. As discussed, however, no *Bruton* error occurred. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Even if a *Bruton* error occurred, there is not a reasonable probability that the outcome of Wilburn's trial would have been different but for defense counsel's failure to object, given the overwhelming evidence of guilt discussed earlier.

Next, Sanders and Wilburn both assert the existence of a due process violation arising from the failure of the prosecutor to produce police scout car video[7] of the chase and arrest of defendants and argue that the trial court erred in failing to give an adverse inference instruction in regard to this failure. We disagree. Although a discovery order entered by the district court required the prosecutor to produce any scout car video, and no such video was produced, defendants have failed to establish the existence of a due process violation or entitlement to an adverse inference instruction.

"A trial court's decision regarding discovery is reviewed for an abuse of discretion." *People v Phillips*, 468 Mich 583, 587; 663 NW2d 463 (2003). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes."

---

[6] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[7] For the sake of simplicity, we will use the term "video" to encompass both video and audio recordings in connection with this issue.

*Jackson*, 292 Mich App at 591. A defendant's claim that he was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). Any underlying factual determinations are reviewed for clear error. *People v Tracey*, 221 Mich App 321, 323; 561 NW2d 133 (1997). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). Questions of law pertaining to jury instructions are reviewed de novo, but a lower court's determination whether a jury instruction applies to the facts of a case is reviewed for an abuse of discretion. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006).

" '[T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Arizona v Youngblood*, 488 US 51, 55; 109 S Ct 333; 102 L Ed 2d 281 (1988), quoting *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. [*Youngblood*, 488 US at 57.]

Therefore, the failure to preserve potentially useful evidence does not constitute a due process violation unless the defendant can demonstrate bad faith. *Id*. at 58. See also *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012) ("If the defendant cannot show bad faith or that the evidence was potentially exculpatory, the state's failure to preserve evidence does not deny the defendant due process."), citing *Youngblood*, 488 US at 57-58. The routine destruction of recordings pursuant to a police department policy where the purpose is not to deprive a defendant of evidence does not amount to bad faith. See *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

In this case, there is no evidence that any scout car video showing the police chase and arrests of defendants even exists or that it ever existed. Although several police officers involved in this incident testified that their police cars contained recording equipment, they had no control over the recording system and did not know whether a recording existed. Even if scout car video existed, Sanders and Wilburn have failed to demonstrate that it was potentially exculpatory. See *Heft*, 299 Mich App at 79; *Johnson*, 197 Mich App at 365. The testimony of the police officers reflects that Sanders and Wilburn were each inside the stolen vehicle and were then arrested after getting out and running away on foot. Wilburn threw a gun to the ground when he got out of the stolen vehicle. Sanders and Wilburn both made statements admitting their roles in the crimes. Sanders made the following admission concerning his behavior during the police chase: "I panicked. I didn't stop when they tried to pull me over. I hit [an undercover police vehicle] while I was trying to get away. I stopped, got out and ran, they obviously got me though." Wilburn admitted that he was inside the stolen vehicle and that he had a gun. Given this evidence, Sanders and Wilburn have failed to demonstrate that any scout car video of this incident, if it ever existed, was potentially exculpatory.

Nor have Sanders and Wilburn demonstrated any bad faith on the part of the police or the prosecutor with respect to the failure to preserve or produce the scout car video. There is no evidence that any scout car video of this incident ever existed, let alone that it was destroyed in bad faith. Sergeant Patrick Saunders, the officer-in-charge, testified about his efforts to obtain any scout car video. Saunders, who was employed by the Wayne State University Police Department, was told by a Detroit Police Department officer with whom Saunders worked to request the video through the Detroit Police Department Help Desk. Saunders sent two emails to the Help Desk requesting any video recordings but received no response. Saunders also called the Help Desk approximately four times. The Help Desk phone recording said to press two for scout car video, which Saunders did, but he never reached a live human being. He left voicemails but received no response. Saunders did not know if any scout car video existed. If it existed, Saunders lacked access to it and did not know where it was stored. He last called the Help Desk three or four weeks before trial. Saunders did not believe that he asked the prosecutor for help in obtaining the video and did not ask for a subpoena. In short, Saunders made efforts to obtain any video that existed but was unsuccessful in obtaining it. The failure to make additional efforts was at worst negligent, but negligence does not establish the existence of bad faith. See *Youngblood*, 488 US at 58 (finding no evidence of bad faith where the failure of the police to preserve evidence could "at worst be described as negligent."). Nor is there any apparent motive for why the prosecutor or the police would not wish to produce any video that existed, given that there is no basis to conclude that the video was potentially exculpatory.

Because Sanders and Wilburn have failed to demonstrate that any video existed, that it was potentially exculpatory, or that the police or the prosecutor acted in bad faith, Sanders and Wilburn have not established a due process violation. *Youngblood*, 488 US at 57-58; *Heft*, 299 Mich App at 79; *Johnson*, 197 Mich App at 365. For the same reason, the trial court did not err in declining to provide an instruction that the juries may infer that any scout car video would have been favorable to Sanders and Wilburn. See *People v Davis*, 199 Mich App 502, 514-515; 503 NW2d 457 (1993), overruled on other grounds by *People v Grissom*, 492 Mich 296 (2012) (the trial court did not err in declining to give an adverse inference instruction where the defendant failed to show that the prosecutor acted in bad faith in failing to produce evidence and where the evidence simply did not exist or could not be located).

Wilburn also argues that he was denied his constitutional right to present a defense by the prosecutor's failure to produce Christian Flennoy as a witness at trial and by the trial court's denial of Wilburn's request for an adverse inference instruction on this matter. Any testimony by Christian would have pertained only to the other acts evidence; she is the daughter of Natalie Flennoy, the owner of the black Explorer that was stolen on the night before the carjacking of Ogburn.

We disagree with Wilburn's argument. Whether a defendant was denied his constitutional right to present a defense is a constitutional question that is also reviewed de novo. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). A defendant has a constitutional right to present a defense. *Unger*, 278 Mich App at 249-250. This right is not absolute and must "accommodate other legitimate interests in the criminal trial process." *Id*. at 250 (quotation marks and citation omitted). "States have been traditionally afforded the power under the constitution to establish and implement their own criminal trial rules and procedures." *Id*. "Like

other states, Michigan has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials." *Id*.

Under Michigan law, the prosecutor is no longer required to produce all res gestae witnesses. *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000). Rather, the prosecutor must exercise due diligence to produce a witness that the prosecutor has endorsed under MCL 767.40a(3). *People v Eccles*, 260 Mich App 379, 388; 677 NW2d 76 (2004). See also *People v Steanhouse*, 313 Mich App 1, 15; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016) ("Under MCL 767.40a, the prosecutor has a duty to disclose all known res gestae witnesses, to update the list as additional witnesses become known, and to provide to the defendant a list of witnesses the prosecution intends to call at trial.") (quotation marks, brackets, and citations omitted). Because Christian was not endorsed as a witness on the prosecutor's witness list, the prosecutor was under no obligation to produce her. As the trial court noted, defendants were free to call Christian as a witness. The prosecutor was obligated to provide reasonable assistance in locating Christian if a defendant requested such assistance, see MCL 767.40a(5); *Snider*, 239 Mich App at 423, but there is no indication here of such a request having been made. Because the prosecutor did not fail to comply with any duty with respect to this witness, the trial court properly declined to provide an adverse inference instruction. *Id*.

Wilburn asserts that Christian's preliminary examination should have been presented at trial as former testimony of an unavailable witness under MRE 804(b)(1) but offers no argument to support a conclusion that Christian was unavailable as defined by MRE 804(a). An appellant may not simply announce a position and leave it up to this Court to rationalize the basis for his claims or elaborate his arguments. *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001). The record does not establish that Christian was unavailable under MRE 804(a).

Overall, Wilburn has identified no basis to conclude that any Michigan statutes or rules regarding the production of witnesses or the admissibility of former testimony are arbitrary or disproportionate to their purposes such that Wilburn was denied his constitutional right to present a defense. See *Unger*, 278 Mich App at 250 (rules excluding evidence "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.") (quotation marks and citations omitted).

Campbell argues that the trial court committed various errors in rendering its findings of fact in Campbell's bench trial. We disagree. A trial court's findings of fact in a bench trial are reviewed for clear error. *People v Lanzo Constr Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. This Court gives regard to the trial court's special opportunity to assess the credibility of witnesses who appeared before it. MCR 2.613(C). Any questions of law are reviewed de novo. *Lanzo Constr Co*, 272 Mich App at 473.

In a bench trial, a trial court is required to announce its findings of fact and conclusions of law. MCR 2.517(A)(1). "Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without overelaboration of detail or particularization of facts." MCR 2.517(A)(2). "Ultimately, this Court must review a trial court's findings in the context of the specific legal and factual issues raised by the parties and the evidence. If the trial court was

aware of the issues in the case and correctly applied the law to the facts, its findings are sufficient." *Lanzo Constr Co*, 272 Mich App at 479 (quotation marks and citation omitted).

Campbell asserts various challenges to the trial judge's findings of fact. First, Campbell argues that the trial judge improperly relied on Campbell's statement to the police because the judge failed to indicate that she was considering the fact that the interrogation was not recorded. Campbell claims that the trial judge erred in failing to give herself an adverse inference instruction. MCL 763.9 provides that if a statement to police is not recorded as required by MCL 763.8, "the jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement." The trial judge provided an instruction to the juries for Sanders and Wilburn in accordance with the language of MCL 763.9. A trial judge in a bench trial is presumed to possess an understanding of the applicable law. *Lanzo Constr Co*, 272 Mich App at 484. Therefore, the judge is not required to instruct herself on the law in open court. *People v Cazal*, 412 Mich 680, 691 n 5; 316 NW2d 705 (1982). Indeed, the trial judge's presumed awareness in this case of the statute allowing consideration of the failure to record the interrogation is reinforced by the fact that the judge had already instructed the juries for Sanders and Wilburn on this very point. Campbell's argument on this matter is devoid of merit.

Campbell next argues that the trial court improperly relied on portions of the statements of Campbell's codefendants mentioning a Rolex watch in order to conclude that Campbell was a participant in the crimes. In stating its findings of fact, the trial court noted testimony from a police officer that he confiscated a Rolex watch from Campbell at the Detroit Detention Center following Campbell's arrest. The trial court further stated:

> Now, I don't know whether it's true or not that that Rolex was stolen, or if any of that stuff that's in the other defendant's [sic] statements about how they came in possession of that Rolex, but it certainly – it certainly – there's nothing on this record that would cause this Court to believe that that was Mr. Campbell's Rolex, where would he get a Rolex from?

> It indicated here that he went to – up to the 12[th] grade on his Constitutional Rights Notification form, and it doesn't indicate anything about him, you know, being in any kind of way – having any kind of job or anything that would enable him to be able to afford a Rolex watch.

> So, the very fact that he had this Rolex watch in his possession, it was found on his person, demonstrates to me that he was not just merely present, that he was very active and willing participant of the crime spree, that he decided to go on with his buddies Mr. Sanders, Mr. Wilburn, and the defendant who has already pled guilty in this matter, who I believe his name was Mr. Claudius Morrow. They were all in this thing together.

Campbell asserts that he was denied his right of confrontation because the trial court relied on portions of the statements of Campbell's nontestifying codefendants regarding the Rolex watch. This Court has declined to extend the *Bruton* rule (discussed earlier) to bench

trials.  See *People v Butler*, 193 Mich App 63, 65-66; 483 NW2d 430 (1992), abrogated on other grounds by *People v Reese*, 491 Mich 127 (2012).  Further, the trial court did not rely in its bench trial findings on codefendants' statements.  The court noted, in addition to other evidence of guilt, that a Rolex watch was confiscated from Campbell following his arrest and that there was no indication that it belonged to Campbell, given his lack of discernable means to purchase it.  The trial court said that it did not know whether the comments in codefendants' statements regarding the Rolex were true.  Again, the trial court is presumed to know the applicable law, *Lanzo Constr Co*, 272 Mich App at 484, and had already instructed codefendants' juries regarding the limited use of each defendant's statement.  In addition, after codefendants' statements were admitted, the trial court emphasized outside the presence of the juries that it would not attribute any assertions in those statements to Campbell.

But even if the trial court considered codefendants' statements, any error was harmless beyond a reasonable doubt given the overwhelming evidence of guilt against Campbell, including police testimony that Campbell was apprehended in the driver seat of the stolen vehicle following a pursuit by police, that a gun was then found in the driver seat, and that Campbell made a statement admitting his participation in the crimes.  See *Banks*, 438 Mich at 427 (an error in admitting a codefendant's statement is harmless beyond a reasonable doubt if the properly admitted evidence of guilt is overwhelming and the prejudicial effect of the codefendant's statement is insignificant by comparison).

Campbell next argues that the trial court failed to engage in a meaningful discussion of the absence of scout car video.  Campbell says that the trial court should have explained its findings regarding the lack of video and the failure to comply with the district court's discovery order.  Campbell's argument is cursory.  He cites no pertinent authority establishing that the trial court was required to discuss the lack of scout car video in its findings of fact.  Campbell may not leave it to this Court to rationalize the basis for his claim or to search for authority to sustain or reject his position.  *Kevorkian*, 248 Mich App at 389.  As discussed earlier, there is no evidence that any scout car video existed, that it was potentially exculpatory, or that the prosecutor or the police acted in bad faith in failing to produce it.  Overall, the trial court's findings in the bench trial were sufficient because the court exhibited awareness of the issues in the case and correctly applied the law to the facts.  *Lanzo Constr Co*, 272 Mich App at 479.

Next, Wilburn argues that the trial court abused its discretion in admitting other acts evidence concerning the theft of Natalie's black Explorer.  We disagree.  "While a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion, a preliminary or underlying issue of law regarding the admissibility of the evidence, such as whether a rule of evidence bars admission, is reviewed de novo."  *People v McDade*, 301 Mich App 343, 352; 836 NW2d 266 (2013).  "A trial court abuses its discretion when it chooses an outcome falling outside the range of principled outcomes."  *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity,

intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"To be admissible under MRE 404(b), bad-acts evidence must satisfy three requirements: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *People v Kahley*, 277 Mich App 182, 184-185; 744 NW2d 194 (2007). Also, the trial court, on request, may instruct the jury regarding the limited use of the evidence. *People v Watson*, 245 Mich App 572, 577; 629 NW2d 411 (2001). See also *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

> Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. [*People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (citations omitted).]

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Moreover, all relevant evidence is prejudicial; only *unfairly* prejudicial evidence may be excluded. *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614. Such unfair prejudice may arise where considerations extraneous to the merits of the case are injected, such as jury bias, sympathy, anger, or shock. *Id*.

"[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000). "There must be *such a concurrence of common features* that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design." *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009). "Distinctive and unusual features are not required to establish the existence of a common plan or scheme." *Kahley*, 277 Mich App at 185.

In this case, Wilburn challenges only the first and third factors in determining the admissibility of other acts evidence, i.e., whether the evidence was offered for a proper purpose

-14-

and whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We will address each factor in turn.

The other acts evidence in this case consisted of Natalie's testimony that her black Explorer was stolen on the night before the charged offenses occurred. Later that night, Natalie saw her stolen vehicle, which Sanders was driving and in which Wilburn was a passenger. The next day, Ogburn's burgundy Explorer was taken by Sanders and an accomplice who arrived in a black Explorer. Because Sanders broke Ogburn's glasses, Ogburn could not identify Sanders's accomplice. In his statement to police, Wilburn said that he knew the owner of the black Explorer, that he and his cohorts were riding in the black Explorer when they saw the burgundy Explorer, that they took the burgundy Explorer, and that they then disposed of the black Explorer.

The evidence concerning the theft of Natalie's black Explorer was introduced for the proper purpose of establishing defendants' motive. Wilburn and his cohorts were riding in the black Explorer, which had been stolen the previous night from a woman whom Wilburn said he knew. Sanders and Wilburn knew that Natalie, the owner of the black Explorer, had seen them in that vehicle because they fled at a high rate of speed when she saw them approximately an hour after it was stolen. It is reasonable to infer that defendants needed to find a different vehicle to use before being caught in the stolen black Explorer given that Natalie had seen them in the vehicle. Also, the concurrence of common features supports a logical inference that the charged offenses were part of a common plan, scheme, or system to steal Explorers and ride in them during this ongoing crime spree. A trial court does not abuse its discretion in admitting other acts evidence where "reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts." *Sabin*, 463 Mich at 67. A "trial court's decision on a close evidentiary question such as this one ordinarily cannot be an abuse of discretion." *Id*.

The probative value of the other acts evidence was not substantially outweighed by the danger of unfair prejudice. "Whether other-acts evidence is more prejudicial than probative is best left to the contemporaneous assessment of the trial court." *McGhee*, 268 Mich App at 614 (citation omitted). The evidence concerning the theft of the black Explorer was probative of defendants' motive for stealing the burgundy Explorer and was relevant to their common plan or scheme to steal Explorers. Wilburn identifies no basis to conclude that the other acts evidence was *unfairly* prejudicial. There is no indication of a tendency for this evidence to be given too much weight by the jury. No considerations extraneous to the merits of the case were injected. *Id*. Also, the trial court instructed the juries regarding the limited use of the other acts evidence, which served to alleviate any unfair prejudice. A jury is presumed to follow the trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Wilburn also contends that he was denied due process by the admission of the other acts evidence. We disagree. To preserve a due process argument for appellate review, a defendant must raise an objection on that ground in the trial court. *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). Wilburn did not object on due process grounds below. Therefore, his due process argument concerning the other acts evidence is unpreserved. Unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. Given that the admission of the other acts evidence was proper, no basis exists to

conclude that Wilburn's due process rights were violated. See *Kahley*, 277 Mich App at 186 (finding no due process violation in the proper introduction of other acts evidence).

Even if the introduction of the other acts evidence comprised error, it would not require reversal. A preserved nonconstitutional error does not warrant reversal unless the defendant establishes that it is more probable than not that the error was outcome determinative, i.e., that it undermined the reliability of the verdict. *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014); *People v Blackmon*, 280 Mich App 253, 270; 761 NW2d 172 (2008). Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. Aside from the other acts evidence, there was overwhelming evidence of guilt that included police testimony concerning Wilburn's presence in the stolen burgundy Explorer during the flight from police and his getting out of the stolen vehicle, removing a handgun from his waistband, tossing it to the ground, and running away; and Wilburn's own statement admitting his role in the crimes. Given the strong evidence of guilt, we conclude that any error in admitting the other acts evidence was harmless such that reversal of Wilburn's convictions is therefore not required.

We next address defendants' arguments that the trial court clearly erred in finding that a preponderance of the evidence supported the scoring of various offense variables (OVs) at sentencing. We disagree with defendants' arguments. "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438 (citations omitted). "A sentencing court may consider all record evidence before it when calculating the guidelines, including, but not limited to, the contents of a presentence investigation report, admissions made by a defendant during a plea proceeding, or testimony taken at a preliminary examination or trial." *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012) (quotation marks and citation omitted). "The trial court may rely on reasonable inferences arising from the record evidence to sustain the scoring of an offense variable." *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012), aff'd 495 Mich 33 (2014).

Campbell asserts in a cursory fashion that there was no evidence to support the scoring of OVs 4, 9, and 10. Campbell cites no authority and presents no argument to support his conclusory claim. "As we have repeatedly stated, an appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013) (quotation marks and citation omitted). Campbell has thus abandoned this argument. *Kevorkian*, 248 Mich App at 389. Campbell has also waived this argument for appellate review by failing to identify it as an issue in his statement of questions presented.

*People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011).[8] Further, Campbell concedes that correction of the purported scoring errors would not alter his sentencing guidelines range. Hence, resentencing would not be required even if the claimed errors occurred. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

Sanders and Wilburn each argue that the trial court erred in assessing 10 points for OV 4. OV 4 addresses psychological injury to a victim. MCL 777.34(1); *People v Lockett*, 295 Mich App 165, 182; 814 NW2d 295 (2012). OV 4 requires a 10 point assessment if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). Zero points are to be assessed if "[n]o serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(b). A trial court must assess "10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." MCL 777.34(2). "There must be some evidence of psychological injury on the record to justify a 10-point score." *Lockett*, 295 Mich App at 183. A victim's expression of fearfulness may comprise sufficient evidence of a psychological injury. *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012); *Earl*, 297 Mich App at 109-110.

In his victim impact statement, Ogburn indicated that he had never previously been robbed and that he now fears for his safety and for the safety of a 13-year-old child who lives in his home. At Sanders's sentencing, the trial court noted that Ogburn had been attacked, threatened, beaten about his head, and pushed to the ground, and that he was clearly traumatized when he came to court. The court thus assessed 10 points for OV 4. At Wilburn's sentencing, the prosecutor stated that Ogburn had indicated his everyday functions have been altered drastically as a result of this crime and that he no longer feels comfortable leaving his house. The prosecutor said Ogburn's wife also indicated that Ogburn is "quite jittery. Once they leave to go anywhere he's constantly looking around, he's constantly rushing, you know, jumping inside of the car, looking around, and this has had a great psychological impact on [him]." In assessing 10 points for OV 4 in Wilburn's case, the trial court stated:

> And under the facts and circumstances of this case we had a senior citizen who had some independence, where he felt free to go and run his daily errands, and lead his normal life, and as a result of this happening to him, he's fear [sic], and it's affected the way he lives his life, even if he hasn't sought psychological treatment yet at this point, the guidelines clearly indicate that they can be scored regardless of whether or not treatment has been sought.
>
> It was obvious to me from his demeanor, the way he testified in court, there was even some discussion on the record about the fact that the media published his address and that caused him to be in fear for his safety and for retaliation, so for those reasons that have been previously outlined on this record,

---

[8] Campbell's statement of questions presented identifies an issue under *People v Lockridge*, 498 Mich 358, 373; 870 NW2d 502 (2015), but does not identify an issue concerning a traditional OV scoring error. Campbell's *Lockridge* argument is discussed later.

over your defense attorney's objection, I'm scoring Offense Variable 4 at 10 points, sir.

The trial court did not clearly err in assessing 10 points for OV 4 with respect to Sanders and Wilburn given Ogburn's expressions of continuing fearfulness as a result of this incident.

Sanders and Wilburn each challenge the assessment of 50 points for OV 7. OV 7 addresses aggravated physical abuse. MCL 777.37(1); *Hardy*, 494 Mich at 439. At the time of defendants' sentencings, this OV required a score of 50 points if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense[.]" MCL 777.37(1)(a).[9] In *Hardy*, 494 Mich at 440, our Supreme Court addressed the fourth category for which 50 points may be assessed under OV 7, i.e., "conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). The *Hardy* Court "conclude[d] that it is proper to assess points under OV 7 for conduct that was intended to make a victim's fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich at 441. "The relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *Id*. at 443-444. The Court found that racking a shotgun during a carjacking to make the victim fear an imminent violent death supported an assessment of 50 points for OV 7. *Id*. at 445. Also, threatening and striking victims with what appeared to be a sawed-off shotgun went beyond what was necessary to commit an armed robbery and was intended to increase the victims' fear by a considerable amount, thus supporting a 50-point assessment for OV 7. *Id*. at 446-447.

In assessing 50 points for OV 7 in Sanders's case, the trial court stated:

. . . I think it should be 50 'cause they did not have to do that man like that. They didn't. He was elderly man, and they did not have to beat him and knock and push him to the ground. And a man of his age he could've suffered a broken hip, anything could happened to him, he was elderly, and they didn't have to do him like that. And I think that was aggravated physical abuse. I do. I know you don't agree but it was done for no purpose to increase his fear and his anxiety, because when they first approached him, he was trying to fight with Mr. Sanders. He was trying to get that gun pointed down away from him, and it wasn't till the other defendant came out and used additional force to increase his fear and his anxiety so that they could effectuate this crime, and it was wrong. They didn't have to do that old man like that, so I'm scoring it at 50 points, but your objection is noted you can say whatever want [sic], preserve it for the record.

---

[9] MCL 777.37(1)(a) was amended effective January 5, 2016, to require a 50 point assessment if "[a] victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." See 2015 PA 137.

Sanders's counsel then said that Ogburn did not identify anyone other than Sanders and that Ogburn said he fell rather than being pushed. The trial court responded:

Okay. So maybe he fail [sic] when the other another [sic] guy jumped out and pointed the gun at him, but the facts are the same. I think it was to increase his anxiety, and he suffered, I really do think he did, and that's my position. But if the Court of Appeals says I'm wrong, I'll stand corrected, but your objections are duly preserved for this record.

In assessing 50 points in Wilburn' case, the trial court stated:

Okay. Well as I indicated in the previous cases, the facts and circumstances of this case were that one armed individual first approached the complaining witness, the victim, and tried to commandeer his vehicle from him, and when he resisted the second defendant, who I believe the facts support was more than likely Mr. Wilburn, your client, came out, said it something to him to the effect of gimme (sic) that truck bitch, or something. And that's when he was overpowered and taken to the ground, and I think that that was done, specifically, to increase his level of fear and anxiety, because when it was just one defendant who was trying to accost him and commandeer his vehicle, he resisted.

And it was only with the additional force, the additional weapon being produced and those threatening words being used to this senior citizen, I mean who talks to a [sic] elderly person that way? He didn't have to be done that way, it was only done specifically for the purpose of increasing his fear and to humiliate him. And it wasn't necessary in order to commit the crime, so for those reasons I believe that it's accurately scored at 50 points, but your objection is duly preserved for this record.

The trial court did not clearly err in assessing 50 points for OV 7. Sanders and Wilburn used additional force beyond the minimum necessary to commit armed robbery and carjacking. Sanders grabbed Ogburn's arm, spun Ogburn around, and attempted to hit Ogburn in the face with a gun. Ogburn reflexively threw his hand up, but the gun still made contact with Ogburn's face, injuring his lip, breaking his glasses, and knocking his glasses to the ground. As Sanders and Ogburn were "tussling" over Sanders's gun, another man appeared on the side of the black Explorer and pointed another gun at Ogburn. Ogburn could not see the second man well enough to identify him because Ogburn's glasses had been broken. After the second man pointed the gun at him, Ogburn stopped "tussling" with Sanders. Sanders or the other man then "mushed" Ogburn "upside the head" with a gun and said, "[G]imme this truck bitch." One of the men pushed Ogburn away, and Ogburn partially fell to the ground. The men got in Ogburn's vehicle and drove away. Defendants' actions certainly exceeded the minimum amount of force needed to commit the offenses, and it is reasonable to conclude that the conduct was intended to make Ogburn's fear or anxiety greater by a considerable amount. Ogburn could not identify the second gunman because Sanders broke Ogburn's glasses, but a reasonable inference exists that it was Wilburn. Wilburn admitted in his statement to the police that he participated in the carjacking and that he had a gun, and Wilburn threw a gun to the ground when he ran from the stolen vehicle. Overall, then, the assessment of 50 points for OV 7 was proper.

Wilburn challenges the assessment of 10 points for OV 9. OV 9 addresses the number of victims. MCL 777.39(1); *People v Fawaz*, 299 Mich App 55, 62; 829 NW2d 259 (2012). A trial court must assess 10 points if "there were 2 to 9 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(c). An assessment of zero points is required if "there were fewer than 2 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(d). Each person who was placed in danger of physical injury or loss of life must be counted as a victim. MCL 777.39(2)(a); *People v Morson*, 471 Mich 248, 262; 685 NW2d 203 (2004); *People v Waclawski*, 286 Mich App 634, 682; 780 NW2d 321 (2009). "A person may be a victim under OV 9 even if he or she did not suffer actual harm; a close proximity to a physically threatening situation may suffice to count the person as a victim." *People v Gratsch*, 299 Mich App 604, 624; 831 NW2d 462 (2013), vacated in part on other grounds by 495 Mich 876 (2013).

The trial court assessed 10 points for OV 9 because, in addition to Ogburn, the police officers involved in the pursuit of Wilburn and his cohorts could be counted as victims, especially Lenz, whose vehicle was struck by the fleeing stolen car. The trial court's decision was not clearly erroneous. Although a defendant's conduct after completion of the sentencing offense does not relate back to the offense for the purpose of scoring OV 9, *People v McGraw*, 484 Mich 120, 122; 771 NW2d 655 (2009), armed robbery is a transactional offense that includes " 'acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property.' " *People v Chambers*, 277 Mich App 1, 7 n 5; 742 NW2d 610 (2007), quoting MCL 750.530(2). "Accordingly, the course of an armed robbery includes the robber's conduct in fleeing the scene of the crime." *People v Mann*, 287 Mich App 283, 287; 786 NW2d 876 (2010). Carjacking also includes acts that occur "in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the motor vehicle." MCL 750.529a(2). Although the police chase in this case occurred more than four hours after defendants took Ogburn's vehicle and cell phone, it is reasonable to infer that defendants were fleeing the police after the commission of the larceny and were attempting to retain possession of the stolen property.[10] The trial court thus properly included Lenz as a victim in addition to Ogburn because Lenz was placed in danger of physical injury or death when his vehicle was rammed or sideswiped by the fleeing stolen vehicle occupied by defendants. Other police officers who pursued the fleeing stolen vehicle at high rates of speed were also placed in danger of physical injury or death. There was no clear error in assessing 10 points for OV 9.

Sanders and Wilburn next challenge the assessment of 15 points for OV 10. They contest the finding of predatory conduct. OV 10 addresses the exploitation of a vulnerable victim. MCL

---

[10] In seeking a directed verdict regarding certain weapons offense counts that he claimed were duplicative, Wilburn's counsel conceded below that the flight from police was part of the same transaction as the underlying robbery and carjacking. A defendant may not "assign error on appeal to something his own counsel deemed proper at trial. To do so would allow a defendant to harbor error as an appellate parachute." *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998) (citation omitted).

777.40(1). The trial court must assess 15 points if predatory conduct was involved. MCL 777.40(1)(a). " 'Predatory conduct' means preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization." MCL 777.40(3)(a). A 15-point assessment is proper only if the preoffense conduct is commonly understood as predatory in nature, such as lying in wait or stalking, "as opposed to purely opportunistic criminal conduct or preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection." *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011) (quotation marks and citation omitted). Predatory conduct does not have to be directed toward the particular or specific person who is ultimately victimized. *Id*. at 459. In *Huston*, 489 Mich at 454-455, 459-460, our Supreme Court concluded that the defendant engaged in predatory conduct by lying in wait while armed and hidden from view in a parking lot at night until a random person came along who could be robbed.

In deciding to assess 15 points for OV 10 in Sanders's case, the trial court stated:

Okay. Well, I think it should be 15 because this was definitely predatory conduct. They had stolen one car, and they were patrolling the streets looking for another car to steal when they happened upon the victim, who just happened to be coming from getting his car washed or the store. I don't know what he was but he was prey.

And then if you look at their statements, and I'm allowed to consider things that were not presented, you know, that uncharged conduct when I scored the guidelines. They were just on a crime spree preying on anybody that they could find in concluding [sic: including] that unnamed, unknown victim who got jacked and beat up at the stoplight for his fake Carties (sic) and his fake Rolex watch. So I believe it should be 15 points, but your objection is duly noted for this record, and Offense Variable 10 will be scored at 15 points.

Likewise, the trial court stated at Wilburn's sentencing:

Offense Variable 10, exploitation of a vulnerable victim, they have that scored at 0. I don't believe that that's accurately scored. I believe it should be scored at 15 points 'cause I think that they specifically targeted this elderly gentleman, because he was in the right place at the right time, as they were trolling the streets looking for someone else's vehicle to steal so they could continue their crime spree.

The trial court also expressed agreement with the following comments by the prosecutor:

Judge, I believe that 15 points would be accurate in that the testimony of the witnesses was that after the, I believe it was the black Explorer, the Explorer of the female victim was stolen, that the female victim came looking for her truck, that she found Mr. Wilburn and Mr. Sanders inside of the truck.

They were aware that they were being looked for because they then ran away from her inside of her truck. That they're aware that not only the victim is looking for them, but at this time the police officers are also looking for them, and

-21-

so one of the statements of the defendants, I believe it was actually Mr. Campbell, indicated that they needed to get out of the truck, basically, they needed to get out of the female victim's truck.

And so they're looking for another vehicle to get into when they come into contact with our male victim, Mr. Ogburn. And so when they see Mr. Ogburn attempting to get inside of his vehicle, it's then that they circle around and car jack him and rob him. And so I believe 15 points scored by the Court would be accurate.

The trial court properly assessed 15 points for OV 10. The evidence supports a conclusion that Sanders and Wilburn were riding in a stolen black Explorer and that the owner of that Explorer had seen them in it the night before, causing them to flee at a high rate of speed. It is reasonable to infer that defendants were looking for another vehicle to steal so that they could get out of the stolen black Explorer before being caught. While driving around with guns, they came upon Ogburn, an older man who was in the process of getting into his burgundy Explorer. After driving past Ogburn, defendants did a U-turn and came back to him, got out of the black Explorer, and attacked him. In short, defendants were in effect "prowling" or patrolling the streets looking for someone such as Ogburn whom they could victimize by taking his car, and they did just that after passing him and then circling back to ambush him with guns. Defendants' statements indicate that, after robbing and carjacking Ogburn, they disposed of the stolen black Explorer, rode around in Ogburn's burgundy Explorer, and robbed another, unknown person who was stopped at a red light; this supports the conclusion that the victimization of Ogburn was not merely opportunistic but was part of a predatory effort to find another vehicle to use so that they could get out of the stolen black Explorer before being caught and then continue their crime spree unabated. Therefore, the evidence supports the trial court's finding of predatory conduct.

Wilburn challenges the assessment of 10 points for OV 14. OV 14 addresses the offender's role. MCL 777.44(1); *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013). An assessment of 10 points is required if the defendant "was a leader in a multiple offender situation." MCL 777.44(1)(a). A leader is "a guiding or directing head of a group." *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated in part on other grounds by 494 Mich 880 (2013) (quotation marks and citation omitted). A "multiple offender situation" is "a situation consisting of more than one person violating the law while part of a group." *Id*. In scoring OV 14, the entire criminal transaction is considered. MCL 777.44(2)(a); *Gibbs*, 299 Mich App at 493. If there were three or more offenders, then more than one offender may be deemed to have been a leader. MCL 777.44(2)(b).

In deciding to assess 10 points for OV 14, the trial court stated:

Offense Variable 14, offender's role in multiple offender's situations. They have that scored at 0 points, and I have said this before in every other case and I'll say it now. I think it should be scored at 10 because I believe, Mr. Wilburn, I do. I believe you were the leader.

I believe that for whatever reason they were all following your lead, and I don't know how you came up with this plan or why you hatched it, but I believe

-22-

the evidence supports in this case that you were the leader, and I believe it should be scored at 10 points.

The trial court did not clearly err in assessing 10 points for OV 14. There is no question that this case involved a multiple offender situation, given that Wilburn, Sanders, and Campbell were engaged in criminal activities together. Wilburn's own statement supports a reasonable inference that he was acting as a leader. Wilburn said that "[w]e was already in this black Ford, that my man had took from this lady I knew that lived on Glynn. He picked me up and we was riding, in that stolen. We saw the old man in the burgundy Explorer, we turned around and took his s---, too." Wilburn said that they then got rid of the black Explorer and robbed another person of his sunglasses and a Rolex watch. Wilburn described that robbery:

> I had seen him take the glasses off his face while we was next to him at the red light. We was in the burgundy Ford. I had that .22 cal on that one. We got his glasses and Roley (sic) watch, and they was throwing s--- out of the windows of the car, I was picking that s--- up too.

Wilburn's description of the incident suggests that he was a leader. It was Wilburn who saw the unnamed victim take sunglasses off his face; Wilburn and his cohorts then took that victim's sunglasses and Rolex watch; and the cohorts threw items out of the windows of this victim's car, which Wilburn picked up. A reasonable inference arises from Wilburn's statement that he was guiding or directing his cohorts. The trial court properly assessed 10 points for OV 14.

Wilburn next challenges the assessment of 25 points for OV 19. OV 19 addresses a threat to the security of a penal institution or a court or interference with the administration of justice or the rendering of emergency services. MCL 777.49. An assessment of 25 points is required if "the offender by his or her conduct threatened the security of a penal institution or court." MCL 777.49(a). In scoring OV 19, a court may consider events that occurred after the completion of the charged offense. *People v Smith*, 488 Mich 193, 200; 793 NW2d 666 (2010). Therefore, to properly assess 25 points under OV 19, it is unnecessary for the sentencing offense *itself* to occur in, or to threaten the security of, a courthouse or penal institution. *Id.* at 200-201.

In deciding to assess 25 points for OV 19, the trial court stated:

> First of all, the victim's cell phone was stolen, and I think when victims [sic] cell phones are stolen, that interferes with the administration of rendering of emergency services because they can't call for help.

> And then we all remember Mr. Wilburn and his first incident where he tried to distract us while his co-defendant Mr. . . . who was it Campbell?

> *DEPUTY*: Campbell.

> *THE COURT*: Armed himself with a pen, and we can't forget Mr. Wilburn tried to escape after the jury's verdict. Well, I don't know if he was trying to escape or if he was just upset, but it definitely disrupted these court proceedings, and we had to have extra deputies come in and Mr. Wilburn had to be subdued by my deputies. And so for those reasons, based on his behavior both

-23-

in this court, and during the sentencing offense, I believe it should be scored at 25 points over the objection of both the prosecutor and the defense.

The trial court did not clearly err in assessing 25 points for OV 19. The theft of Ogburn's cell phone did not threaten the security of the court or a penal institution, but the trial court's assessment of 25 points for OV 19 is supported by the other facts cited by the trial court. The trial court reasonably concluded that Wilburn's behavior in the courtroom presented a threat to the security of the court. The trial court explained at numerous hearings what occurred in the ink pen incident, i.e., that Wilburn created a distraction by coughing loudly as well as laughing and that Campbell snuck an ink pen into his sleeve. Wilburn's comments at sentencing effectively admitted that the incident occurred but merely disputed the trial court's inference concerning why Wilburn was laughing, i.e., Wilburn denied that he was attempting to create a distraction so that Campbell could arm himself. The trial court also explained another event that happened in the courtroom; after the verdict was announced, Wilburn disrupted the court proceedings such that additional deputies had to come into the courtroom to subdue him. At sentencing, Wilburn admitted to having engaged in an altercation with the deputies in the courtroom. Given the trial court's explanation of what was observed in the courtroom and Wilburn's own admissions, the record amply supports the trial court's finding that Wilburn threatened the security of the court.

Next, defendants argue that a Sixth Amendment violation occurred due to judicial fact-finding in the scoring of OVs which increased their respective sentencing guidelines ranges. We agree. To preserve an argument that a Sixth Amendment violation occurred due to judicial fact-finding in the scoring of OVs, a defendant must raise an objection on that ground at sentencing or in a motion for resentencing or a motion to remand. See *Steanhouse*, 313 Mich App at 42; *People v Terrell*, 312 Mich App 450, 464; 879 NW2d 294 (2015), held in abeyance by ___ Mich ___; 878 NW2d 480 (2016). Although defendants objected to the scoring of various OVs at sentencing, they did not object on the ground of a Sixth Amendment violation. Defendants did not move for resentencing. Sanders raised the Sixth Amendment issue in a motion to remand, which this Court denied. *People v Sanders*, unpublished order of the Court of Appeals, entered March 23, 2016 (Docket No. 327060). Campbell and Wilburn did not file a motion to remand. Therefore, the issue is unpreserved for Campbell and Wilburn but preserved for Sanders.

A Sixth Amendment challenge presents a question of constitutional law that is reviewed de novo. *People v Lockridge*, 498 Mich 358, 373; 870 NW2d 502 (2015). Unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

In *Lockridge*, 498 Mich at 364, our Supreme Court held that Michigan's sentencing guidelines are constitutionally deficient under the Sixth Amendment to the extent that "the guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range, i.e. the 'mandatory minimum' sentence under *Alleyne* [*v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013)]." As a remedy for this constitutional violation, our Supreme Court "sever[ed] MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory." *Lockridge*, 498 Mich at 364. The Court also struck "down the requirement in MCL 769.34(3) that a sentencing court that

departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure." *Id*. at 364-365. The Court held "that a guidelines minimum sentence range calculated in violation of *Apprendi* [*v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000),] and *Alleyne* is advisory only and that sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness." *Lockridge*, 498 Mich at 365. Courts must continue to determine the applicable guidelines range and take it into account at sentencing. *Id*.

For cases held in abeyance for *Lockridge*, virtually all of which involved challenges that were not preserved in the trial court, our Supreme Court held that when facts admitted by the defendant and facts found by the jury were sufficient to assess the minimum number of OV points needed for the defendant's score to fall within the cell of the sentencing grid under which he was sentenced, then the defendant has suffered no prejudice from any error, no plain error has occurred, and no further inquiry is warranted. *Lockridge*, 498 Mich at 394-395. However, a defendant's Sixth Amendment right is impaired if the "facts admitted by a defendant or found by the jury verdict were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced." *Id*. at 395. "[A]ll defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry." *Id*. "[I]n cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error." *Id*. at 397. Such a remand (known as a *Crosby* remand) is warranted only in cases in which the defendant was sentenced on or before July 29, 2015, the date of the *Lockridge* decision. *Id*.[11] On remand,

> a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by law, if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence. [*Id*. at 398 (quotation marks and citations omitted).]

As discussed, although this issue is unpreserved for Campbell and Wilburn, Sanders preserved his *Lockridge* issue by raising it in a motion to remand. In *People v Stokes*, 312 Mich

---

[11] For defendants sentenced after the *Lockridge* decision, traditional plain-error review will apply. *Lockridge*, 498 Mich at 397. In the present case, defendants were sentenced before the date of the *Lockridge* decision.

App 181, 198; 877 NW2d 752 (2015), held in abeyance by ___ Mich ___; 878 NW2d 886 (2016), this Court explained that a preserved *Lockridge* error is not structural and is therefore subject to the harmless beyond a reasonable doubt standard. This Court further held that in order to determine whether a preserved *Lockridge* error was harmless, the *Crosby* remand procedure described in *Lockridge* must be followed. *Id*. at 198-199. That is, the *Crosby* remand procedure applies to both preserved and unpreserved pre-*Lockridge* sentencing errors. *Id*. at 200-202.

Campbell asserts a *Lockridge* error, claiming that the trial court did not find facts beyond a reasonable doubt to support some of his OV scores. The prosecutor agrees that OVs 4, 7, 9, 10, and 19 were not scored on the basis of facts admitted by defendant or found beyond a reasonable doubt, and that without the scoring of those OVs, Campbell's guidelines range would be reduced, entitling him to a *Crosby* remand. We agree.

The trial court assessed 10 points for OV 4 to Campbell. A trial court must assess 10 points for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). The trial court (which was the trier of fact in Campbell's bench trial) made no finding beyond a reasonable doubt and Campbell made no admission that a victim suffered a serious psychological injury. It is not an element of the offenses of which Campbell was convicted. The trial court's assessment of 10 points for OV 4 was based on judicial fact-finding by a preponderance of the evidence.

The trial court assessed 50 points for OV 7 to Campbell. As of the date of sentencing, the trial court was required to assess 50 points for OV 7 if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense[.]" MCL 777.37(1)(a). The trial court made no finding beyond a reasonable doubt and Campbell made no admission that a victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase a victim's fear and anxiety. It is not an element of the offenses of which Campbell was convicted. The trial court's assessment of 50 points for OV 7 was based on judicial fact-finding by a preponderance of the evidence.

The trial court assessed 10 points for OV 9 to Campbell. A trial court must assess 10 points if "there were 2 to 9 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(c). The trial court did not find beyond a reasonable doubt and Campbell did not admit that there were two to nine victims. There was no element of the offenses of which Campbell was convicted that establishes that there were two to nine victims. The trial court's assessment of 10 points for OV 9 was based on judicial fact-finding by a preponderance of the evidence.

The trial court assessed 15 points for OV 10 to Campbell. A trial court must assess 15 points for OV 10 if predatory conduct was involved. MCL 777.40(1)(a). The trial court did not find beyond a reasonable doubt and Campbell did not admit that there was predatory conduct. It is not an element of the sentencing offenses. The trial court's assessment of 15 points for OV 10 was based on judicial fact-finding by a preponderance of the evidence.

The trial court assessed 25 points for OV 19. An assessment of 25 points is required if "the offender by his or her conduct threatened the security of a penal institution or court." MCL

-26-

777.49(a). The trial court did not find beyond a reasonable doubt and Campbell did not admit that he threatened the security of a penal institution or court.[12] It is not an element of the sentencing offenses. This assessment was based on judicial fact-finding by a preponderance of the evidence.

Subtracting 10 points from the OV 4 score, 50 points from the OV 7 score, 10 points from the OV 9 score, 15 points from the OV 10 score, and 25 points from the OV 19 score, reduces Campbell's total OV score from 155 points to 45 points. This changes his OV level from VI to III, causing his sentencing cell to change from D-VI to D-III on the Class A grid. His sentencing guidelines range would then become 108 to 180 months, instead of the originally calculated range of 171 to 285 months. See MCL 777.62. It follows, then, that facts admitted by Campbell or found beyond a reasonable doubt at trial were insufficient to assess the minimum number of OV points necessary for Campbell's score to fall within the cell of the sentencing grid under which he was sentenced. Campbell's minimum sentence of 15 years for armed robbery did not constitute an upward departure from the originally calculated guidelines range of 171 to 285 months. It is therefore necessary to remand Campbell's case to the trial court in accordance with the *Crosby* remand procedure.

In Sanders's case, the trial court likewise engaged in judicial fact-finding in assessing 10 points for OV 4, 50 points for OV 7, 10 points for OV 9, 15 points for OV 10, and 10 points for OV 19. Subtraction of these points reduces Sanders's total OV score from 125 points to 30 points. This changes his OV level from VI to II, causing his sentencing cell to change from D-VI to D-II on the Class A grid.[13] His sentencing guidelines range as a second habitual offender would then become 81 to 168 months, instead of the originally calculated range of 171 to 356 months. See MCL 777.62; MCL 777.21(3)(a). Therefore, facts admitted by Sanders or found beyond a reasonable doubt by the jury were insufficient to assess the minimum number of OV points necessary for Sanders's score to fall within the cell of the sentencing grid under which he was sentenced. Sanders's minimum sentence of 23.75 years for armed robbery did not constitute an upward departure from the originally calculated guidelines range of 171 to 356 months. It is therefore necessary to remand Sanders's case to the trial court for the *Crosby* remand procedure.

Wilburn also is entitled to a *Crosby* remand, as the prosecutor again concedes. The trial court used judicial fact-finding to assess 10 points for OV 4, 50 points for OV 7, 10 points for OV 9, 15 points for OV 10, 10 points for OV 14, and 25 points for OV 19.[14] Subtraction of these

---

[12] At sentencing, Campbell's attorney conceded that Campbell tried to take a pen but denied that Campbell intended to pose a danger to the court or court staff, claiming that taking the pen was merely "an act of stupidity" that Campbell thought was "funny."

[13] Sanders cursorily asserts there was also judicial fact-finding in the assessment of five points each for OV 3 (physical injury to victim) and OV 12 (contemporaneous felonious criminal acts), but subtraction of 10 more OV points would still place him in the D-II cell. See MCL 777.62.

[14] As discussed earlier, Wilburn admitted at sentencing some facts that were pertinent to the assessment of 25 points for OV 19. Wilburn did not, however, admit that his actions comprised a threat to the security of the court. Rather, it was the trial court's reasonable inference from the

points reduces Wilburn's total OV score from 180 points to 60 points. This changes his OV level from VI to IV, causing his sentencing cell to change from D-VI to D-IV on the Class A grid. His sentencing guidelines range as a third habitual offender would then become 126 to 315 months, instead of the originally calculated range of 171 to 427 months. See MCL 777.62; MCL 777.21(3)(b). Therefore, facts admitted by Wilburn or found beyond a reasonable doubt by the jury were insufficient to assess the minimum number of OV points necessary for Wilburn's score to fall in the cell of the sentencing grid under which he was sentenced. Wilburn's minimum sentence of 35.5 years for armed robbery did not constitute an upward departure from the originally calculated guidelines range of 171 to 427 months. It is therefore necessary to remand Wilburn's case to the trial court for the *Crosby* remand procedure.

Next, Sanders argues that his armed robbery and carjacking sentences are invalid because the trial court imposed the 75-year maximum sentences on the basis of a misconception of the law. The determination whether a sentence is invalid presents a question of law, which is reviewed de novo. See *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997).

At Sanders's sentencing hearing, the trial court originally stated that it was sentencing Sanders to 23.75 years to life in prison for armed robbery and carjacking. Later, the following exchange occurred concerning the maximum sentence:

> *MR. GERARD* [prosecutor]: Your Honor, just to clarify his tail on this is life, you're not setting a term of years?
>
> *THE COURT*: Oh, I don't know that confuses me.
>
> *MS. LEWIS* [Sanders's counsel]: You determine the years (sic).
>
> *THE COURT*: I do.
>
> *MS. LEWIS*: Yeah.
>
> *THE COURT*: Oh, okay. Well, we'll make it 75, 'cause yeah it has to be.
>
> *MS. LEWIS*: Two-thirds –
>
> *COURT REPORTER*: It has to be two-thirds through?
>
> *THE COURT*: And you have to reasonably be able to service it.
>
> *MS. GERARD*: To serve it.
>
> *MS. LEWIS*: Right.
>
> *MS. GERARD*: Correct.

facts regarding what occurred in the courtroom that led to this assessment. Hence, the assessment of 25 points for OV 19 was not based entirely on Wilburn's admissions.

*THE COURT*:  And you're 29 so I think you'll reasonably be able to serve that, but If [sic] I'm wrong the Court of Appeals I'll [sic] tell me.

*MS*. *GERARD*:  Thank you, Judge.

*THE COURT*:  I hope I got it right, I mess these up all the time.

Sanders asserts that the trial court imposed the maximum sentence of 75 years in an apparent effort to comply with the *Tanner* rule that a minimum sentence may not exceed 2/3 of the maximum sentence.  See *People v Tanner*, 387 Mich 683, 690; 199 NW2d 202 (1972). Sanders argues that the trial court's arithmetic was faulty because Sanders's minimum sentence of 23.75 years is less than 1/3 of the maximum sentence of 75 years.  Sanders notes that the *Tanner* rule is inapplicable when the statutory maximum punishment is life imprisonment or any term of years.  See *People v Floyd*, 490 Mich 901, 902; 804 NW2d 564 (2011).  The relevant sentencing offenses in this case, armed robbery and carjacking, are punishable by imprisonment for life or any term of years, MCL 750.529; MCL 750.529a, thereby making the *Tanner* rule inapplicable, *Floyd*, 490 Mich at 902.  Because a sentence is invalid if it is based on a misconception of the law, *Miles*, 454 Mich at 96, Sanders claims that his sentence is invalid.

The trial court did not state that it was applying the *Tanner* rule.  The term "two-thirds" was used at sentencing only by defense counsel and the court reporter.  Nonetheless, the trial court's comments could be interpreted as suggesting an erroneous belief that the *Tanner* rule was applicable.  It is not clear what the trial court meant when the court said, "Well, we'll make it 75, 'cause yeah it has to be."  After the trial court said this, defense counsel and the court reporter used the term "two-thirds[,]" and the trial court did not explain further its reasoning on the matter.  Because we are ordering a *Crosby* remand as discussed earlier, we agree with the prosecutor that, in addition to following the *Crosby* remand procedures, the trial court on remand should also clarify whether the trial court at sentencing was relying on the *Tanner* rule to set the maximum sentences.  If the trial court was erroneously applying the *Tanner* rule to set the maximum sentences, then the trial court shall resentence Sanders on armed robbery and carjacking because those sentences would be based on a misconception of the law.

Finally, Wilburn argues that the trial court erred in making his felony-firearm sentences consecutive to his sentence for carrying a concealed weapon.  We agree.  Because this issue is unpreserved, our review is for plain error affecting substantial rights.  *Carines*, 460 Mich at 763.

A sentence for felony-firearm is to be served consecutively only to a sentence for a predicate felony of the felony-firearm conviction.  *People v Clark*, 463 Mich 459, 463-464; 619 NW2d 538 (2000).  Carrying a concealed weapon may not serve as a predicate felony of a felony-firearm conviction.  MCL 750.227b(1); *People v Cortez*, 206 Mich App 204, 207; 520 NW2d 693 (1994).  Therefore, the trial court plainly erred in ordering Wilburn's carrying a concealed weapon sentence to run consecutively to his felony-firearm sentences, and the error affected Wilburn's substantial rights.  The prosecutor confesses error on this issue.  Accordingly, the trial court on remand shall amend Wilburn's judgment of sentence to provide that his felony-firearm sentences run concurrently with his carrying a concealed weapon sentence.

We affirm defendants' convictions.  With respect to defendants' sentences, we remand the cases for implementation of the *Crosby* remand procedure and for various corrections and clarification on sentencing issues as discussed in this opinion.  We do not retain jurisdiction.


/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Kurtis T. Wilder